# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 6, 2011

## STATE OF TENNESSEE v. BRIAN MONTREL BRAWNER, RANDY LEON MILLER, and SAM EDWARD STEVENSON

**Direct Appeal from the Circuit Court for Madison County**
**No. 10-125     Roy B. Morgan, Jr., Judge**

**No. W2010-02591-CCA-R3-CD  - Filed May 3, 2012**

The Madison County Grand Jury indicted the defendants, Brian Montrel Brawner, Randy Leon Miller, and Sam Edward Stevenson, with attempted first degree murder, aggravated assault, especially aggravated kidnapping, and aggravated arson for having assaulted, kidnapped, and set fire to the victim, Freddy Jones.  At the conclusion of their joint trial, a Madison County jury convicted Defendants Brawner and Stevenson of aggravated assault, especially aggravated kidnapping, and facilitation of attempted first degree murder.  The jury convicted Defendant Miller of aggravated assault, aggravated arson, especially aggravated kidnapping, and attempted first degree murder.  The trial court merged Defendant Brawner's and Defendant Stevenson's aggravated assault convictions into their convictions for facilitation of attempted first degree murder and sentenced them to effective terms of thirty and fifty-three years, respectively.  The trial court  merged Defendant Miller's aggravated assault conviction into his conviction for attempted first degree murder and sentenced him to an effective term of forty years in the Department of Correction.  Defendant Miller raises the following four issues on appeal:  (1) whether the evidence was sufficient to sustain his convictions for aggravated arson and especially aggravated kidnapping; (2) whether his dual convictions for attempted first degree murder and aggravated arson violate principles of double jeopardy; (3) whether the State should have been required to make an election of offenses for the aggravated assault charges; and (4) whether the trial court erred by ordering consecutive sentencing.  Defendant Stevenson raises essentially two issues on appeal:  (1) whether the evidence was sufficient to sustain his convictions for facilitation of attempted first degree murder and especially aggravated kidnapping; and (2) whether the State should have been required to elect the offenses for his aggravated assault charges.  Defendant Brawner challenges the sufficiency of the evidence in support of his convictions for facilitation of attempted first degree murder and especially aggravated kidnapping.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and JEFFREY S. BIVINS, JJ., joined.

Roger A. Staton, Jackson, Tennessee, for the appellant, Brian Montrel Brawner; Joseph T. Howell, Jackson, Tennessee, for the appellant, Randy Leon Miller; and Mike Mosier, Jackson, Tennessee, for the appellant, Sam Edward Stevenson.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The three defendants lived in a garage apartment located at the rear of the Alexander Street residence in downtown Jackson in which the victim lived. According to the State's proof at trial, on the night of November 2, 2009, Defendants Brawner and Stevenson grabbed the victim from the front porch of his home, severely beat him, and carried him to the garage apartment. There, Defendant Miller poured rubbing alcohol over him and set him on fire. As the victim rolled around on the floor attempting to put out the flames, the defendants beat and kicked him. After the flames were extinguished, Defendant Stevenson placed the victim in a shower and ran cold water over him. The defendants then confined the victim in various places in the apartment until the next morning, when the defendants either fell asleep or passed out. At that point, the victim was able to escape and summon help.

## Trial

## State's Proof

The State's first witness at the defendants' September 2010 trial was a young neighbor of the victim's who witnessed the initial beating and kidnapping. Twenty-one-year-old Colton Forrest identified the victim's residence, 115 Alexander Street, as a "crack house" that was located just a few houses down from his family's home. He said that he and his brother were on the front porch of their home sometime between 10:30 and 11:00 p.m. on November 2, 2009, when they heard an altercation, looked toward the victim's house, and saw a white man being grabbed by the throat by a black man. Forrest stated that the first black man was joined by a second black man and that one of the two held the white man while the other one beat him. After two or three minutes, the two men picked up the victim and carried or dragged him down the driveway toward the garage. Forrest testified that his

mother, who was a police officer, arrived home from work approximately ten minutes later and that he and his brother informed her of what they had witnessed. She, in turn, called the police.

Ricky Melton, Forrest's brother, corroborated Forrest's account, testifying that he saw two black men beat a white man in front of the victim's house for about five minutes before they picked him up and dragged him down the driveway toward the rear of the residence.

Officer Tommy Ferguson of the Jackson Police Department testified that he responded to the scene shortly before midnight on November 2, 2009, but was unable to find any evidence of an assault. He spoke with several individuals who were sitting on the front porch of the residence at 115 Alexander Street, but he did not enter either the front or rear residence.

Sergeant Melanie Melton of the Jackson Police Department testified that she arrived home from work at approximately 11:20 p.m. on November 2, 2009, to be met in the driveway by her two sons, who relayed what they had just witnessed. She said she called dispatch at approximately 11:50 p.m., met Officer Ferguson outside when he arrived at the scene, and advised him to call another officer to assist because of what she knew about the victim's residence. She said that Officer Ferguson told her before his departure that he had not been able to find any evidence of an assault.

At approximately 9:30 a.m. the next morning, Sergeant Melton was awakened by the severely burned, weak-voiced victim knocking at her door. She described his appearance:

> One whole side of his face was just totally – just awful looking. His eye was swelled shut. He was burnt. His hair was burnt off all the way down his neck. His clothes were burnt to his skin. He was in his underwear and his underwear was burnt to his skin. He was in sock feet and they were burnt all the way down on the sides, and he was just kind of trembling like.

Officer Ted Maxwell of the Jackson Police Department, who responded to Sergeant Melton's house ten or fifteen minutes before the ambulance arrived to transport the victim to the hospital, testified that the victim told him that "Sam" and "Killer Bee" had burned him and pointed out the location where the burning had occurred. Officer Maxwell stated that he went first to the main residence of 115 Alexander Street, where he spoke with Eddie McCrae, who told him who was renting the garage apartment. He then went to the garage apartment, where he found three men and two women: Lewis Brawner, who answered the door; Defendant Sam Stevenson, who was hiding under the covers in a bed inside the apartment; Defendant Brian Brawner; Christina Coelsch; and Ashley Scruggs. Officer

Maxwell identified photographs of the crime scene, which, he said, showed what appeared to be spots of blood in the driveway and inside the apartment. He stated that Defendants Brawner and Stevenson were the only two that were arrested at the scene. He did not hear the name of Randy Miller that morning, and Miller was not in the apartment.

Kesha Gulish, the registered nurse who performed a triage assessment of the victim upon his 10:00 a.m. arrival at Jackson-Madison County General Hospital, testified that the victim had burns on his face, back, chest, and legs, was "writhing back and forth" on the EMS stretcher, and reported his pain level as ten on a scale of one to ten. The victim also reported that he had a history of marijuana, cocaine, and tobacco use and told her that he had been held at gunpoint all night after being burned with alcohol. As part of her assessment, she inspected his nose and mouth and noted that his nasal hairs were singed. She said that the victim remained at the hospital for a little over an hour before being transferred by helicopter to the burn center at the Regional Medical Center in Memphis.

On cross-examination, Nurse Gulish acknowledged that the victim reported that he usually consumed eight to nine quarts of alcohol daily. She further acknowledged that the victim's medical records reflected that he tested positive for cocaine at the time he was brought to the hospital.

Dr. Mario Figueroa, the emergency room physician who treated the victim at Jackson-Madison County General Hospital, testified that the victim had second degree burns over twenty-five percent of his body, which necessitated his transfer to the burn center in Memphis. The victim was in excruciating pain, and before his transfer Dr. Figuero administered Dilaudid, the most powerful pain reliever he had. He also replaced the victim's lost fluids and gave him antibiotics to help prevent life-threatening infections.

Investigator Michael Parson of the Jackson Police Department, who was assigned to the Violent Crimes Unit in November 2009, testified that the victim first identified his three attackers while he was in the ambulance at the crime scene and then gave him a formal written statement at the Jackson hospital. Two of three individuals named by the victim, Defendants Sam Stevenson and Brian Brawner, were present in the garage apartment, and Investigator Parson directed that they be taken into custody pending further investigation. Investigator Parson identified various pieces of evidence collected at the crime scene, including a dish towel with apparent bloodstains and a prescription pill bottle in the victim's name, both of which were found in a chair inside the apartment. On cross-examination, he testified that the story the victim gave him in the back of the ambulance was the same as the one he gave him during the formal statement at the hospital, which was that he had been set on fire by "Sam" (Defendant Sam Stevenson), "Killer Bee"(Defendant Brian Brawner) and "Bootsie" (Defendant Randy Miller). He said that no gun was found at the crime scene.

-4-

Nineteen-year-old Ashley Scruggs, who acknowledged that she was currently in jail for violating her probation in a cocaine possession case, testified that on the night of November 2, 2009, she was smoking marijuana and drinking alcohol in the garage apartment of 115 Alexander Street, which she described as a "drug house." She said that she was sitting on the couch inside the apartment when she heard the sounds of a scuffle, looked up, and saw the three defendants dragging the struggling victim by his arms into the apartment. She stated that after Defendant Brawner had shut and locked the door to the apartment, Defendant Miller announced his intention of burning the victim and then poured alcohol on him and set him on fire. Scruggs described the episode:

> After they had drug him in the house, [Defendant Brawner] shut the door, and he told everybody that was in there – he was like, "Can't nobody come in or go out," and [the victim] laid on the floor for a second, and [Defendant Miller] had said, "I'm gonna burn him." He said, "I'm gonna set him on fire. Where's the alcohol at," and . . . he got the alcohol off the table, and he poured it on [the victim] and set him on fire.

Scruggs testified that the victim, who lay on the floor burning for at least a minute, screamed and called out for God to help him. Finally, the three defendants, who were beating and kicking him during that time, "stomped [the fire] out." The defendants then set the victim on a chair in the corner near the bathroom and, because he complained of being cold, set a space heater near him and wrapped him in a sheet. Scruggs said that she tried to leave after the victim was set on fire but was stopped by a woman named Kirsten, who jerked her back by the arm and punched her in the eyes. She stated that the others in the apartment were afraid that she would go to the police and therefore ordered her into the back bedroom, where she eventually fell asleep. The next morning, she was awakened by the arrival of the police.

On cross-examination, Scruggs testified that the people in the apartment at the time the victim was burned, besides herself, the victim, and the three defendants, were a woman named Christina, the woman named Kirsten, and Kirsten's sister, Jewell. Scruggs acknowledged that she never saw Defendant Stevenson do anything to the victim other than drag him into the apartment and then "try to put him out with his feet." She later made a similar acknowledgment with respect to Defendant Brawner's role in the incident. Finally, she acknowledged that she was not wearing her eyeglasses at the time she witnessed the victim's attack.

The victim testified that in November 2009, he was a cocaine addict and lived in the front residence of 115 Alexander Street, which was both a "crack house" and a house of prostitution, while the three defendants lived in the garage apartment out back. At about

10:30 or 11:00 p.m. on November 2, 2009, he was sitting on the front porch of his residence when Defendants Brawner and Stevenson grabbed him off the porch and kicked and beat him for what seemed like "forever." He was "pretty beaten up by then," and they picked him up by his arms and legs and carried him to the garage apartment and threw him on the floor. At that point, Defendant Miller came up behind him, threw alcohol over him, and set him on fire.

The victim testified that the pain was "unbearable" and that he rolled back and forth in an attempt to extinguish the flames. In the meantime, Defendants Stevenson and Brawner were both kicking him. The victim, contrary to Scruggs, characterized their actions as an attempt to prevent him from putting out the fire, rather then to help him extinguish the flames. He said that all his clothes were burned off his body and that when the flames were finally out, Stevenson picked him up and threw him into a cold shower, which caused him "[u]nbelievable pain." Afterwards, Stevenson and Brawner made him remain in the bathroom for "quite awhile," before they moved him to a back room, where they forced him to sit on a five-gallon bucket for two or three hours. Finally, the defendants allowed him to move to a recliner.

The victim estimated that he was confined in the apartment for approximately nine hours until all three defendants finally fell asleep or passed out and he was able to lift the chain off the door and escape. He said he tried to leave at one point before that, but Stevenson hit him in the face with his fist. He was also threatened by Defendant Brawner, who was armed with a pistol.

The victim testified that when he was able to get away from the apartment, he ran to the police woman's house four doors down and asked her to call 9-1-1. The last thing he could recall before waking up in the Memphis hospital two or three days prior to Christmas was being airlifted from Jackson by helicopter. He was unsure of the total length of time he was hospitalized but said that he weighed only 94 pounds, down from his normal weight of 160 or 170 pounds, by the time of his release. The victim displayed his permanent scars to the jury and stated that his physicians had informed him that he would continue to experience pain for the rest of his life due to the fact that the nerve endings in his back had been burned.

On cross-examination, the victim acknowledged that there were other individuals besides the defendants in the garage apartment, including "Forty" and "Little Lewis." He further acknowledged that he said nothing in his statement to Investigator Parson about Defendant Stevenson's having kicked him while he was on fire or having forced him to sit on a five-gallon bucket. He explained, however, that he was on morphine at the time he gave the statement. He also pointed out that he said nothing in the statement about Stevenson's having put a cigarette out on the top of his head while he was in the back room but that

Stevenson had done so. He testified that Defendant Miller left the apartment with a woman at one point during the night and thus did not, himself, physically prevent him from leaving the apartment. He further testified, however, that he was never left alone and that "[the defendants] had somebody there steadily watching."

## Defendants' Proof

Alicia Burgess, the victim's daughter, testified that the victim and Defendant Brawner had been friends in the past but that the victim had also at times been afraid of Brawner. She said that, to her knowledge, the victim did not owe Brawner any money. She acknowledged having spoken with Defendant Stevenson's sister but denied having told her that the victim was going to testify that all that Stevenson and Brawner did to him was beat him up.

Defendant Stevenson attempted to have his sister, Liz Tamika McIntosh, offer two different pieces of testimony, both of which the trial court ruled inadmissable and instructed the jury to disregard: first, that the victim's daughter told McIntosh that the victim had said he was not angry at Stevenson and Brawner because they were not the ones who burned him; and second, that Stevenson and Brawner had partied at her house from around midnight on November 2 until the next morning.[1]

Defendant Brian Brawner, who acknowledged that he had a 2006 conviction for possession of marijuana with the intent to sell, testified that he saw the victim off and on the evening of November 2, 2009, at both the main residence and the garage apartment. The victim had a vodka bottle in his hand earlier in the evening and was in his usual "high" and drunk state. Brawner stated that at one point that night he (Brawner) got into an altercation with a man named "Love," who then departed the scene with the victim. Brawner left as well but then returned with Defendants Stevenson and Miller after he received a phone call. When he returned, he got into a brief scuffle with the victim on the front porch of the main house. Brawner explained that he was angry because the victim failed to warn him that "Love" had returned to the house armed with a gun.

Brawner testified that he and the victim both fell down during their struggle and that several other men he did not know, including "Forty" and "Little Lewis," grabbed the victim and carried him toward the garage apartment. Concerned for the victim's well-being, he walked with Stevenson to the apartment, stepped in the door, and found the victim on the floor. Brawner said that he told the others in the apartment to calm down and leave the

---

[1] The trial court ruled the first piece of evidence inadmissible because it was hearsay and the second piece of evidence inadmissible because it constituted a partial alibi and the defendant had failed to provide notice of an alibi defense.

victim alone and then walked with Stevenson to the rear of the apartment to talk. When he turned around, he saw that the victim was on fire. Brawner testified that he and Stevenson immediately ran to the victim to help Miller, who was already attempting to put out the flames. He did not see anyone pour alcohol on the victim or set him on fire.

Brawner further testified that after the three of them had succeeded in extinguishing the fire, he helped the victim to the couch and gave him a sheet to wrap around him while Scruggs ran to get a heater, which she placed in front of the victim. The victim at first kept saying that he was in pain. However, he never asked for an ambulance and after about five or ten minutes, he calmed down and asked for some crack cocaine to smoke, which "Little Lewis" gave him.

Brawner testified that he and Miller were at the front house when the police arrived that night to investigate. However, neither of them reported that the victim had been burned or even talked to the officers. After the police left, Stevenson joined them at the front house, and Brawner and Stevenson then drove with Scruggs and Coelsch to Tamika McIntosh's house, where they remained for a few hours. They returned to the Alexander Street residence at 4:30 or 5:00 the next morning. The victim, who was sitting in a recliner in the garage apartment, asked for more crack cocaine, and "Little Lewis" gave him another "20 rock," which the victim shared with Stevenson and Coelsch.

Brawner denied that he had a gun with him on November 2-3, 2009, or that anyone prevented the victim from leaving the residence. He also denied that he told anyone to douse the victim with alcohol and set him on fire or that he knew about anyone else's plans to do so.

Officer Ted Maxwell, recalled as a witness for Defendant Miller, reiterated that the victim told him that he had sustained his injuries at the hands of "Sam" and "Killer Bee"; the victim never mentioned Miller to him.

Following deliberations, the jury convicted Defendant Miller of attempted first degree premeditated murder, aggravated assault, especially aggravated kidnapping, and aggravated arson. The jury acquitted Defendants Brawner and Stevenson of the aggravated arson count of the indictment and convicted each of them of facilitation of attempted first degree premeditated murder, aggravated assault, and especially aggravated kidnapping.

### Defendant Miller's Sentencing

At the sentencing hearing, Jacqueline Jenkins, Miller's mother, testified that Miller was a good son and requested the court to court exercise mercy in sentencing. Finding two

enhancement factors and no mitigating factors applicable, the trial court sentenced Miller as a Range I offender to twenty years at thirty percent for the attempted murder conviction; five years at thirty percent for the aggravated assault conviction, which the court merged into the attempted murder conviction; twenty years at 100 percent for the especially aggravated kidnapping conviction; and twenty years at 100 percent for the aggravated arson conviction. Finding Miller to be both a professional criminal and a dangerous offender, the court ordered that the aggravated arson and especially aggravated kidnapping convictions be served consecutively, for a total effective sentence of forty years in the Department of Correction. The court also made the additional findings required to support its classification of Miller as a dangerous offender, finding that the aggregate length of his sentence reasonably related to the severity of his offenses and was necessary to protect the public from his further criminal conduct. See State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995).

## ANALYSIS

### I. Sufficiency of the Evidence

All three defendants raise various challenges to the sufficiency of the evidence. When the sufficiency of the evidence is challenged on appeal, our task is to consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human

-9-

> atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

### A. Especially Aggravated Kidnapping

All three defendants challenge the sufficiency of the evidence in support of their convictions for especially aggravated kidnapping. To sustain those convictions, the State had to prove beyond a reasonable doubt that the defendants removed or confined the victim so as to substantially interfere with the victim's liberty and that the victim suffered serious bodily injury. See Tenn. Code Ann. §§ 39-13-302(a), -305(a)(4) (2010).

#### 1. Defendant Miller

Miller argues that the proof was insufficient to sustain his conviction for especially aggravated kidnapping because "there was absolutely no evidence . . . that [he] ever confined or otherwise prevented the victim . . . from leaving the apartment." We respectfully disagree.

The jury was instructed on the theory of criminal responsibility, which provides that a defendant can be found guilty of an offense if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, [he or she] solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). When viewed in the light most favorable to the State, the evidence establishes that Miller and his two co-defendants dragged or carried the victim into the apartment, where Miller set him on fire and all three defendants kicked him as he burned. The evidence further establishes that the victim sustained serious bodily injury from the burning and that one or more of the defendants prevented him from leaving the apartment to seek help for his injuries. Under a theory of criminal responsibility, the State was not required to show that Miller himself ever physically prevented the victim from leaving the apartment; it was sufficient for the State to show that Miller acted with the intent to promote or assist his co-defendants in their confinement of the victim. Accordingly, we affirm Miller's conviction for the especially aggravated kidnapping of the victim.

## 2. Defendants Brawner and Stevenson

Defendants Brawner and Stevenson argue that the evidence was insufficient to sustain their especially aggravated kidnapping convictions because the State failed to prove beyond a reasonable doubt the element of serious bodily injury. Specifically, they assert that their kidnapping of the victim culminated in their delivery of him to the garage apartment and that any serious bodily injury he suffered was administered solely at the hands of Defendant Miller after their own kidnapping of the victim was completed. We, again, respectfully disagree.

Viewed in the light most favorable to the State, the evidence establishes that all three defendants dragged or carried the victim into the apartment, where Defendant Miller set him on fire, causing him serious bodily injury. The evidence further establishes that, rather than attempting to get help for the victim, Defendants Brawner and Stevenson kept him confined in various places in the apartment, preventing his escape by punching him in the face and threatening him with a gun, until the next morning when he was able to lift the chain off the door and flee to a neighbor's house for help. This evidence was more than sufficient for the jury to find Defendants Brawner and Stevenson each guilty of the especially aggravated kidnapping of the victim. We, therefore, affirm those convictions.

## B. Aggravated Arson

Defendant Miller also challenges the sufficiency of the evidence in support of his aggravated arson conviction. For the purposes of this case, aggravated arson occurs when a person knowingly damages any personal property by means of fire without the consent of the owner and where any person suffers serious bodily injury as a result of the fire. See Tenn. Code Ann. §§ 39-14-302(a)(2), -303(a)(1) (2010). Miller contends that the evidence was insufficient to sustain his aggravated arson conviction because the proof at trial was that he set the person, rather than the clothing, of the victim on fire. He concedes that his position is contrary to this court's recent holding in State v. Courtenay Darrell Robertson, No. W2009-01853-CCA-R3-CD, 2010 WL 4812774 (Tenn. Crim. App. Nov. 18, 2010), but nonetheless argues that the issue should be reconsidered.

The defendant in Courtenay Darrell Robertson, like Miller, argued that the evidence was insufficient to sustain his conviction for aggravated arson because the only personal property to which he set fire was the clothing that was being worn by the victim at the time of the fire. After noting that the definition of "personal property" in the Tennessee Code includes "'money, goods, chattels, things in action, and evidences of debt,'" we concluded that the victim's shirt constituted personal property. Id. at *6 (quoting Tenn. Code Ann. § 1-3-105(21)). Noting, further, the lack of any Tennessee case law on the issue of whether

clothing ceases to be personal property when worn, we then reviewed two cases from California and Florida, whose reasoning we found persuasive, before concluding that Tennessee's arson statute covers the scenario in which a victim's clothing is burned while on the victim. We wrote:

> Under these definitions, the victim's shirt constituted personal property. The question remains, however, whether the fact that she was wearing the shirt transformed the character of the shirt as personal property. In other words, were the victim's shirt and her person one and the same? While there does not appear to be any Tennessee cases on point, certain out-of-state cases are helpful to our review of this issue.
>
> In the California case of People v. Reese, the California Court of Appeal reasoned that the legislature intended to protect personal clothing, "particularly clothing being worn at the time of the burning or fire," when it expanded the definition of the term "property," as used in the arson statute, to include personal property. People v. Reese, 182 Cal. App. 3d 737, 227 Cal. Rptr. 526, 528 (Cal. Ct. App. 1986).
>
> In State v. Harrington, the defendant poured lamp oil on the victim and her clothing and set her and her clothing on fire. Harrington, 782 So. 2d 505, 506 (Fla. Dist. Ct. App. 2001). The victim subsequently died because of her injuries, and the state charged the defendant with murder and arson. Id. The trial court dismissed the arson charge, in part because it did not consider the burning of the victim's clothing to be sufficient to support the charge. In interpreting the arson statute, which defined arson as damaging by fire "a dwelling or its contents," the Florida District Court of Appeal ruled that the victim's clothing constituted contents of a dwelling. It reasoned as follows:
>
>> Clearly, if [the defendant] had gone to a closet and set fire to any of [the victim's] clothing hanging in the closet, we would not be faced with this issue. Merely because [the victim] was wearing the clothing at the time [the defendant] set the clothing on fire does not make them any less "contents" of the dwelling.
>
> Id. at 507 (citation omitted).
>
> We find the analysis and reasoning set forth in the aforementioned cases to be persuasive and applicable to this case. In this case, the evidence

established that the defendant poured alcohol on the victim and her shirt, then struck a lighter. The victim testified that when the defendant struck the lighter, her shirt "just blazed up." She did not give consent to the defendant to set fire to her shirt, and she suffered second degree burns to sixty percent of her body. We conclude, therefore, that the evidence was sufficient for a rational jury to find, beyond a reasonable doubt, that the defendant was guilty of aggravated arson.

Id.

In this case, we, likewise, conclude that the evidence, which showed that Defendant Miller set fire not only to the victim's person but also to the victim's clothing, was sufficient to sustain his conviction for aggravated arson. Accordingly, we affirm Defendant Miller's aggravated arson conviction.

### C. Facilitation of Attempted First Degree Murder

Defendants Brawner and Stevenson each argue that the evidence was insufficient to sustain their convictions for facilitation of attempted first degree murder because the State failed to prove beyond a reasonable doubt that they knew of Defendant Miller's intention to set the victim on fire or that they furnished any substantial assistance in his actions. Brawner additionally argues that because he was charged with attempted first degree murder for setting the victim on fire, the jury could not have convicted him for facilitation of attempted first degree murder without also finding him guilty of aggravated arson or one of its lesser included offenses. We, once again, respectfully disagree.

First degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2010). "Premeditation" is

an act done after the exercise of reflection and judgment. "Premeditation"" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

For the purposes of this case, a person commits criminal attempt who, acting with the

-13-

kind of culpability otherwise required for the offense: "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offenses." Id. § 39-12-101(a)(3).

Finally, a person facilitates a felony "if knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Id. § 39-11-403(a). Under this statute, a defendant who has been "charged as a party may be found guilty of facilitation as a lesser included offense if the defendant's degree of complicity is insufficient to warrant conviction as a party." Id. § 39-11-403, Sentencing Comm'n Comments.

We conclude that the evidence, when viewed in the light most favorable to the State, was more than sufficient to sustain the convictions for facilitation of attempted first degree murder. As previously discussed, the State's proof established that Defendants Brawner and Stevenson grabbed the victim from the front porch of the main residence and, after administering a severe beating, delivered him to the garage apartment. All three defendants then dragged or carried the victim inside. Once inside, Brawner shut and locked the door, preventing the victim from leaving. As the beaten victim lay on the floor, Defendant Miller announced his intention of burning the victim, looked around the room for the rubbing alcohol, grabbed the bottle of alcohol, poured it over the victim, and then lit him on fire. Brawner and Stevenson then joined Miller in kicking at the burning victim. From all this evidence, a rational jury could have reasonably concluded that Brawner and Stevenson knew of Miller's intent to kill the victim and, although not sharing in that intent, facilitated him in his attempt to do so by delivering the victim to the garage apartment and preventing his escape.

We see no inconsistency in the jury's convicting Brawner and Stevenson of facilitation of attempted first degree murder while at the same time acquitting them of the aggravated arson counts of the indictment. The jury could have logically concluded that Brawner and Stevenson knew of Miller's intent to kill the victim and that they facilitated that effort by delivering the victim to him and preventing his escape but that they did not facilitate Miller's specific acts in setting the victim on fire. Regardless, our supreme court has held that consistency between verdicts on separate counts of an indictment is not necessary because each count is a separate indictment. Wiggins v. State, 498 S.W.2d 92, 93-94 (Tenn. 1973). We, therefore, affirm Defendant Stevenson's and Defendant Brawner's convictions for facilitation of attempted first degree premeditated murder.

## II. Double Jeopardy and Election of Offenses

Both Defendants Miller and Stevenson raise double jeopardy and election of offenses arguments with respect to their convictions. Specifically, Miller argues that his dual convictions for attempted first degree murder and aggravated arson violate double jeopardy principles because both convictions are based on the same course of conduct committed against a single victim. He further argues that the State should have been required to elect which of the multiple acts it intended to rely upon in support of the aggravated assault charges. Defendant Stevenson, similarly, argues that the State should have been required to make an election of offenses and that its failure to do so violated the principles against double jeopardy.

The Double Jeopardy Clause of the United States Constitution states that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb[.]" U.S. Const. amend. V. Article I, section 10 of the Tennessee Constitution similarly provides "[t]hat no person shall, for the same offence, be twice put in jeopardy of life or limb." In State v. Watkins, ___ S.W.3d ___, 2012 WL 758912, at *1 (Tenn. Mar. 9, 2012), our supreme court abandoned the State v. Denton, 938 S.W.2d 373 (Tenn. 1996), four-factor test previously employed by Tennessee courts in determining whether dual convictions violate the prohibition against double jeopardy. Instead, the court adopted the same elements test enunciated by the United States Supreme Court in Blockburger v. United States, 284 U.S. 299, 304 (1932). Under the Blockburger test, the threshold inquiry is whether the defendant's convictions arose from the same act or transgression. Watkins, 2012 WL 758912, at *11. If the convictions do not arise from the same act or transgression, the state and federal prohibitions against double jeopardy are not implicated, and the inquiry ends. Id.

If, however, the convictions arose from the same act or transgression, the court must then determine whether the legislature intended to allow the offenses to be punished separately. Id. at *22. When the legislature has not clearly expressed its intent either to prevent or to preclude the dual convictions, the court must examine the statutes to determine whether the crimes constitute the same offense. Id. "The court makes this determination by examining statutory elements of the offenses in the abstract, rather than the particular facts of the case." State v. Cross, ___S.W.3d ___, 2012 WL 758911, at *5 (Tenn. Mar. 9, 2012) (citations omitted). "[I]f each offense includes an element that the other does not, the statutes do not define the 'same offense' for double jeopardy purposes," and courts "will presume that the Legislature intended to permit multiple punishments." Watkins, 2012 WL 758912, at *21.

The doctrine of election of offenses requires that when there is evidence at trial that a defendant has committed multiple offenses against a victim, the State must elect the facts upon which it is relying to establish each charged offense. State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001) (citations omitted). Thus, when the State presents evidence showing that more than one offense occurred, but the indictment is not specific as to which offense the defendant is being tried for, it is the responsibility of the trial court to require the State to elect which offense is being submitted to the jury. State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999); see also State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991) ( "[I]n cases involving evidence which shows a real potential that a conviction may occur as a result of different jurors concluding that the defendant committed different acts, each of which separately showing the commission of an offense, the trial court must augment the general unanimity instruction to insure that the jury understands its duty to agree unanimously to a particular set of facts.").

As previously discussed, aggravated arson occurs when a person knowingly damages any personal property by means of fire without the consent of the owner and where any person suffers serious bodily injury as a result of the fire. See Tenn. Code Ann. §§ 39-14-302(a)(2), -303(a)(1). First degree premeditated murder, by contrast, is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person commits criminal attempt who, "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" Tenn. Code Ann. § 39-12-101(a)(2).

The two offenses, obviously, contain quite different elements. Therefore, based on our application of the Blockburger test, we conclude that Miller's dual convictions for aggravated arson and attempted first degree premeditated murder do not violate the federal or state prohibitions against double jeopardy. Miller is not entitled to relief on the basis of this claim.

We further conclude that neither Miller nor Stevenson is entitled to relief on the basis of their claims regarding the State's failure to elect offenses. The defendants were charged in the indictment with aggravated assault for "intentionally and/or knowingly caus[ing] serious bodily injury" to the victim. Both Miller and Stevenson argue that there was proof of several different acts, from the initial beating of the victim in the yard of the front residence to the beating and kicking of the victim after he was on fire, on which members of the jury could have based their guilty verdicts as to the aggravated assault count of the indictment.

-16-

We disagree that the proof established multiple offenses of aggravated assault such that the State was required to make an election of offenses. Regardless, we agree with the State that neither Miller nor Stevenson is entitled to relief on this issue because the trial court merged the assault convictions into their respective convictions for attempted first degree murder and facilitation of attempted first degree murder.

### III. Defendant Miller's Consecutive Sentencing

Defendant Miller also challenges the trial court's order of consecutive sentencing. When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of a number of criteria applies, including that "[t]he defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood" or that "[t]he defendant is a dangerous offender whose behavior

indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(2), (4) (2010). When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant. Lane, 3 S.W.3d at 460-61; Wilkerson, 905 S.W.2d at 937-38. The criteria listed in section 40-35-115(b) are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing.

We conclude that the record supports the imposition of consecutive sentencing under either of the two criteria found by the trial court. According to the trial testimony, Defendant Miller dragged the struggling victim into the apartment, doused him with alcohol and set him on fire, beat and kicked at him as he lay burning, and then prevented him from seeking help for his injuries by keeping him confined to the apartment. These actions were sufficient for the trial court to find that Miller was a dangerous offender. In addition, multiple witnesses testified at trial as to the "drug house" character of Miller's residence and Miller's presentence report, which contains three pages of prior misdemeanor convictions, reveals that the twenty-four-year-old defendant reported only a minimal legitimate employment history. Accordingly, we affirm the effective forty-year sentence imposed by the trial court.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE